## In re Anonymous No. 31 D.B. 76

Disciplinary Docket no. 31 D.B. 76.

UNKOVIC, *Board Member,* December 8, 1977—Pursuant to Rule 208(d) of the Pennsylvania Rules of Disciplinary Enforcement (rules), the Disciplinary Board of the Supreme Court of Pennsylvania (board) herewith submits its findings and recommendations to your honorable court with respect to the above proceeding.

### I. HISTORY OF PROCEEDINGS

On November 24, 1976, a petition for discipline was filed by chief disciplinary counsel against respondent. It was alleged in that petition that respondent violated seven disciplinary rules of the code of professional responsibility, as follows:

a. D.R. 1-102(A)(4): A lawyer shall not engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

b. D.R. 1-102(A)(6): A lawyer shall not engage in

any other conduct that adversely reflects on his fitness to practice law;

c. D.R. 6-101(A)(3): A lawyer shall not neglect a legal matter entrusted to him;

d. D.R. 6-101(A)(2): A lawyer shall not handle a legal matter without preparation adequate in the circumstances;

e. D.R. 7-101(A)(1): A lawyer shall not intentionally fail to seek the lawful objectives of a client through reasonably available means;

f. D.R. 7-101(A)(2): A lawyer shall not intentionally fail to carry out a contract of employment entered into with a client for professional services;

g. D.R. 7-101(A)(3): A lawyer shall not intentionally prejudice or damage his client during the course of the professional relationship.

The thrust of the complaint is that respondent was retained by [A] and his wife for the purpose of putting them in voluntary bankruptcy and that respondent failed to take the appropriate actions, although he had advised the [A's] that such actions were being taken—all to the prejudice of the [A's].

The matter was referred to hearing committee [ ], consisting of [ ], Chairman, [ ] and [ ]. Notice of the hearing was sent to respondent and the hearing was scheduled for February 15, 1977, and respondent requested a continuance of the hearing because of prior commitment. This continuance was granted and hearing was rescheduled for March 17 and 18, 1977.

The hearing was held on March 17, 1977, before [ ], Chairman, and [ ]. [ ], the third member of the panel, was not able to be present, and the parties agreed that the hearing should proceed with the two members of the committee.

Petitioner presented its case by offering testimony of nine witnesses and 18 numbered

exhibits. Respondent, appearing pro se, was his only witness.

Petitioner's exhibits consisted of documents pertaining to: retainer of respondent; communications between respondent and clients; creditor matters; Philadelphia Bar Association committee of censors documents and the transcript of testimony.

Neither petitioner nor respondent filed any exceptions to the hearing committee report, and, therefore, we would adopt the findings of fact of the hearing committee which were as follows:

1.  Respondent was born in [　] on [　]. He is married with two children, one a son [　] years of age in law school, and a daughter [　] years of age, who works in a gift shop with respondent's wife. They reside at [　], Pa.

2.  Respondent is a graduate of [　] College and attended [　] Law School, graduating in [　].

3.  From 1951 until 1954, respondent worked in the Department of Collections, [　]. From 1954 to date, he has practiced law in [　] some part of the time as an individual and subsequently with one or two partners.

4.  Respondent's practice consists basically of fifty percent trial work, civil and criminal, twenty-five percent corporate work, fifteen percent to twenty percent bankruptcy and the balance general practice.

5.  In March of 1973, [A], a professional engineer, who resided at 608 Meadowvale Lane, [　] County, Pa., had a full-time job with the [　] in [　].

6.  [A's] wife at that time operated two fabric stores in [X] and [Y], Pa., under the name of [Z]. This business was registered under the names of both Mr. and Mrs. [A].

7. In March of 1973, [A] consulted respondent with respect to the possibility of going into bankruptcy because of the unprofitable store operations conducted by Mrs. [A]. There was discussion at that time of the possibility of keeping the jointly held residence out of the bankruptcy and of making transfers appropriate to accomplish this purpose. Respondent suggested action be withheld for a period of about four months in order to accomplish this.

8. [A] paid respondent a retainer of $200. Respondent advised that he would also receive a fee in the bankruptcy proceedings as counsel for the bankrupt. Respondent indicated that he would handle all matters arising out of the financial difficulties, including the claims of creditors. Both [A] and respondent understood that the retainer was not intended to cover all services which respondent might render. Respondent never asked for nor submitted bills for additional compensation.

9. Sometime after the March meeting, and at respondent's request, [A] supplied respondent with a list of creditors, about 25 in number, totaling approximately $50,000.

10. Pursuant to the understanding that respondent would handle all creditors, [A] sent all dunning letters to respondent and referred all his creditors to respondent for attention.

11. In late September, [A] received a job offer in Iran. He asked respondent about accepting such a position, stating that he would not accept the position if his leaving the country would interfere with the bankruptcy proceedings. Respondent assured [A] that he could accept the position and that the hearing in the bankruptcy would be in early December. As a consequence, [A] accepted the offer

and planned to leave this country at the end of December, 1973.

12. In September of 1973, a creditor, [B], brought suit against Mr. and Mrs. [A] in the United States District Court for the [    ] District of Pennsylvania to recover approximately $13,000 on a note signed by both of them. [A] turned the suit papers over to respondent. Respondent never did anything with respect to this suit because there was no defense to it. A default judgment in the amount of $13,097 was entered against [A] on this action on October 5, 1973.

13. At about this time, respondent advised [A] that the house could not be salvaged because the business was operated under joint names and he indicated that a straight bankruptcy would be necessary. At this time, respondent advised [A] to discontinue payments to creditors, including the mortgagee of the house because the payments might jeopardize the bankruptcy.

14. At respondent's request, the [A's] signed blank bankruptcy forms, presumably petitions and schedules. This was in October or November.

15. The assets of [A] at that time consisted of the residence, worth about $40,000, an automobile, household furniture, goods and fixtures from the stores which had during the fall been moved into the [X] store. The inventory of fabrics was worth between $27,000 to 30,000.

16. The obligations of [A] included the mortgage on the home which approximated $13,000, the [B] judgment, and a note to [C] Bank.

17. Respondent advised [A] that the bankruptcy hearing would be in early December, then on December 16, then in late December, and then in January. Respondent further advised [A] not to

defer leaving for Iran because the presence of Mrs. [A] was enough for the first meeting of creditors.

18. Mrs. [A] stayed in this country in order to testify in a bankruptcy proceeding. Respondent told her that the hearing would be on January 6, 1974, and then on January 22. She advised respondent that the company for which Mr. [A] worked had purchased tickets for her to leave the country on January 28 and she asked if she could leave on that time. Respondent advised that this was satisfactory.

19. Mrs. [A] stayed with friends, Mr. and Mrs. [D] for about two weeks before she left the country and she had all the [A] mail forwarded to the [D's]. She requested [D] to forward mail to them in Iran.

20. When Mrs. [A] left the country, she gave the keys to their residence and to their automobile which was left in the carport to a friend who delivered them to respondent.

21. Counsel for creditor [B] had been in contact with respondent beginning in June of 1973, at which time respondent had told him of the contemplated bankruptcy. In a telephone conversation on January 9, 1974, respondent advised counsel for [B] that [A] had been put into bankruptcy the prior week.

22. The landlord of the [X] property telephoned respondent in January and respondent advised her that [E] was going to be appointed the receiver in the [A] bankruptcy. The landlord called [E] who said he had not heard anything about the bankruptcy.

23. Respondent did not in fact ever prepare or file petitions in bankruptcy, and he did not advise [A] that he had not done so.

24. After Mr. and Mrs. [A] left, foreclosure pa-

pers were received by registered mail by [D] who called respondent, and respondent picked up those papers from [D] and gave them a receipt for the same.

25. The [A's] mail forwarded by [D] contained dunning communications from creditors. [A] wrote respondent five letters with respect to these creditor communications but received no response thereto.

26. Numerous creditors of [A] called [D] and were referred to respondent.

27. Respondent took no action with respect to the foreclosure proceedings and the premises were purchased at sheriff's sale on July 12, 1974, for $33,121.65. Thereafter, the purchaser sold the same in November of 1974 for $40,900. At that time the late 1960 Pontiac was still on the premises in the driveway and the purchaser, upon advice from the State Police, had the vehicle towed away. The residence itself had many broken windows. Water had come in from the outside and soaked the first floor. Apparently, the furnishings had been removed, except for a water-soaked rug.

28. The landlord of the [X] premises wanted to have the merchandise contained therein removed. After consultation with her attorney, and after obtaining clearance that the [C] Bank had no interest in the contents, she arranged to have the material purchased by a dance group for a nominal amount. Before this, she had contacted respondent with respect to the material who said that she would hear from him at some future date. Respondent did not, however, contact her.

29. On June 25, 1963, the committee of censors voted to censure respondent, and on July 19, 1963, a written censure was read to respondent based upon his activities in handling client funds. The

facts of that transaction are set forth in the censure.

30. On May 28, 1968, the committee of censors adopted a resolution approving the filing of a petition with the Court of Common Pleas of [   ] County with a recommendation for censure of respondent for activities arising out of the handling of client funds. The Court of Common Pleas of [   ] County took testimony on the petition of the committee of censors on April 1, 1970, and at that time entered its censure of respondent for his commingling of client funds with his own. The facts relating thereto appear in the transcript of the proceedings on April 1, 1970.

31. On October 16, 1970, respondent was given a written reprimand by the committee of censors of the [   ] Bar Association, the facts relating to which are contained in the written reprimand and which involve respondent's neglect of a matter entrusted to him by a client.

32. On June 10, 1975, an informal admonition was delivered to respondent by chief disciplinary counsel based upon delay in handling a matter entrusted to him by a client, the facts of which appear in the brief summary of complaint upon which the informal admonition was based.

In disciplinary matters, respondent is a recidivist. On two occasions, he had been censured for commingling his funds with those of clients, with the result that clients' money was not properly turned over to clients. On two other occasions, he was called to task for neglecting cases entrusted to him by his clients.

## II. DISCUSSION

In the instant action, respondent was retained to file a petition in bankruptcy on behalf of his clients

and failed to perform. The [A's] had turned over to him all information concerning their creditors and assets, and respondent took no action. Mr. [A], one of the complainants, had a job offered to him in Iran and respondent led him to believe that the bankruptcy papers had been filed and that a first meeting of creditors was scheduled in December. He told Mr. [A] that the date was reset for late December.

Subsequently, he advised Mrs. [A] that hearing was set for January 6 and then later on January 22, and told her that she could leave the country, which she did.

Respondent also advised one of the lawyers for the creditors that the petition in bankruptcy had been filed in January, 1974. Respondent did not file the petition, and, in this respect, he deceived his clients. The clients did communicate with him with respect to dunning letters from creditors, and, even then, he did not advise them that he had not filed the petition. His failure to file the petition and advise clients as to the actual status of the case resulted in prejudice to them, in that the fixtures and personal property were sold for a nominal value, and the real estate was sold at sheriff's sale for approximately $33,000, even though it was resold several months later for $40,000. Other personal property, including the automobile and contents of the home were completely neglected.

Respondent tried to explain away his failure to take action in this matter by saying that at one time he thought it would be an asset bankruptcy, and, when it turned into a no-asset bankruptcy, in his opinion, he felt that it would not do any good to proceed.

We believe that the supposed no-asset situation did not excuse respondent's actions. The [A's]

would have received benefits from the bankruptcy discharge insofar as their future accumulations of assets were concerned. This was denied them by respondent's failure to take action and also by respondent's affirmatively notifying them that he had filed the petition.

By respondent's careless and irresponsible actions, the assets were not disposed of at their realizable value. Creditors were not discharged. In fact, they had larger claims against the [A's] than would have been the case if respondent had performed his role as a lawyer in the proper fashion.

This respondent, as indicated above, has been previously censured for commingling funds and failing to promptly turn over the funds to clients, and also has been neglectful of his clients' cases. In the instant case, he not only neglected the matter for which he was retained, but also lied to his clients and misled them into believing that he had taken the action for which he was retained.

We would agree with the hearing committee that respondent violated the following Disciplinary Rules:

1-102(A)(4)—Engaging in conduct involving dishonesty, fraud, deceit or misrepresentation;

1-102(A)(6)—Engaging in conduct that adversely reflects on his fitness to practice law;

6-101(A)(3)—Failing to act competently by neglecting a legal matter entrusted to him;

7-101(A)(1)—Failing to seek the lawful objectives of a client through reasonably available means;

7-101(A)(2)—Failing to carry out a contract of employment entered into with a client for professional services.

On July 2, 1975, the Supreme Court of Pennsylvania suspended [anonymous] from the practice of law in the Commonwealth for a period of one year. No. 85, Disciplinary Docket no. 1 (no. 48 D.B. 73) [MP-14,536]. In its report and recommendations to the Supreme Court in that action, the Disciplinary Board concluded that respondent had violated Disciplinary Rule 6-101(A)(3) by neglecting legal matters entrusted to him, and also concluded that respondent had violated Disciplinary Rule 7-101(A)(2) by failing to carry out contracts of employment entered into with clients for professional services.

Also on July 2, 1975, the Supreme Court of Pennsylvania suspended [anonymous] from the practice of law for a period of 12 months. No. 93, Disciplinary Docket no. 1 (no. 21 D.B. 74) [MP-15,013]. In its report and recommendations in that action, the Disciplinary Board accepted and adopted as part of the opinion in that case the findings of fact and discussion in the report of the hearing committee dated January 20, 1975. The hearing committee held that respondent had violated Disciplinary Rule 1-102(A)(4) and that respondent had engaged in conduct involving dishonesty, fraud, deceit or misrepresentation.

## III. RECOMMENDATION

The Disciplinary Board respectfully recommends to your honorable court that the recommendation of the hearing committee be adopted and that respondent, be suspended from the practice of law for a period of 12 months.

## ORDER

EAGEN, *C.J.*,—And now, January 9, 1978, the

report and recommendation of the Disciplinary Board of the Supreme Court of Pennsylvania dated December 8, 1977, that respondent be suspended from the practice of law for a period of twelve months, is rejected; and it is ordered and decreed that respondent, be, and he is forthwith suspended from the bar of this court and all courts under its supervisory jurisdiction for a period of three years and until further order of the Supreme Court.

Mr. Justice Larsen would enter an order of disbarment.